UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSHUA L., | ) |
| | ) |
| Plaintiff, | ) No. 20-cv-3213 |
| | ) |
| v. | ) Magistrate Judge Susan E. Cox |
| | ) |
| ANDREW M. SAUL, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff has appealed the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability benefits. Plaintiff asserts the ALJ committed two errors in her analysis of Plaintiff's claims: (1) she improperly discounted the opinion of Plaintiff's treating psychologist, and (2) she improperly discounted Plaintiff's subjective allegations. The parties have filed cross motions for summary judgment addressing these issues.[1] As detailed below, the Court disagrees with Plaintiff's contentions and, therefore, Plaintiff's motion for summary judgment [dkt. 25] is DENIED; Defendant's motion for summary judgment [dkt. 30] is GRANTED.

**1. Background**

**1.1. Plaintiff's Background**

Plaintiff was born in 1992, making him 20 years old as of his amended alleged onset date of disability. [Administrative Record ("R.") 89.] Plaintiff graduated high school and attended several years of college, although he alleges his impairments caused him to withdraw from college. [R. 49, 55, 221, 336.]

Plaintiff reports his mental impairments began in 2011 when he was 19 years old and he

---

[1] Plaintiff has filed a Memorandum in Support of Summary Remand [dkt. 25], which the Court construes as a motion for summary judgment.

experienced the room spin for a second or two. [R. 388.] Subsequently, he reported feeling as if he was constantly in a dream, emotionally numb, and depressed. [R. 476.] At a November and December 2012 psychological evaluation, Plaintiff reported he was majoring in computer science but really wanted to pursue a career as a musician. [R. 478.] He indicated he could achieve his life goals by succeeding in the music industry and often fantasized about touring and being a celebrity. [R. 480.]

In January 2013, Plaintiff was referred to Andrea N. Uribe, D. O., for "med eval for depression and depersonalization." [R. 333.] Plaintiff reported a "mental fog" wherein he "feels disconnected from things, does not feel emotion, no feelings, viewing life from farther back, 'always on auto pilot,' feels like things are not real," and that "his memories belong to someone else." [R. 333-34.] Dr. Uribe completed a Psychiatric Diagnostic Evaluation diagnosing Plaintiff as having major depressive disorder and depersonalization disorder. [R. 333-38.]

During a May 2013 neuropsychological evaluation, Plaintiff demonstrated above average intellectual functioning and intact cognitive functioning across all domains, intact learning and memory functions, and some "very subtle and variable" difficulty with sustaining attention and maintaining focus on a problem-solving strategy, but that his attentional functions were within expectation. [R. 560-63.] Later that year, he played and toured in a band, worked on music, and went on photoshoots. [R. 331, 458.]

A September 2013 sleep study revealed Plaintiff had severe obstructive sleep apnea. [R. 483.] The prescribed treatment included using a CPAP machine and losing weight. [R. 23, 453.] Plaintiff reported success when he used the CPAP machine. [R. 452]. While Plaintiff generally reported compliance with his CPAP to his providers, the Record also reflects several instances of his noncompliance with the prescribed CPAP treatment and resulting fatigue. [R. 493-94, 612, 1023-25.]

In August 2015, Plaintiff reported significant improvement with medication; he also attended college courses, and reported enjoyment of music and sports. [R. 388.] Neuropsychological testing again

2

showed no specific cognitive impairment and mental status examination was unremarkable. [R. 390.] In January 2016, Plaintiff reported dropping out of college because of his worsening depersonalization symptoms. [R. 394.] Yet in June and August 2016, he reported his disassociation was controlled and that psychotherapy was helping his depersonalization. [R. 621, 766.]

Dr. Jeffrey Van Meter, Psy.D., Plaintiff's treating psychologist, began treating Plaintiff sometime around August 2016, and continued through at least the time of Plaintiff's disability appeal. [R. 756-818 (August 8, 2016 through January 29, 2018); R. 916-924 (February 26, 2018 through June 4, 2018); 994-1013 (June 18, 2018 through January 14, 2019); and 1018-1020 (February 8, 2019 through February 25, 2019).] In addition to counseling services, it appears Dr. Van Meter also conducted a single biofeedback session with Plaintiff.[2] [R. 929-31 (Neurofeedback Assessment Summary).]

In January 2017, although he reported his symptoms returned and persisted, Plaintiff appeared very alert and focused on examination, and was trying to have a music label sign him to a music contract. [R. 788-89.] The following month, Dr. Van Meter noted that Plaintiff's self-reported symptoms "seem[] worse than reality reflects." [R. 792.] In March 2017, Plaintiff endorsed increased symptoms after the music label did not sign him. [R. 794.] Three months later, he quit a part-time job at an ice cream shop and joined a new cover band. [R. 792, 803.]

Plaintiff sought treatment from Mayo Clinic specialists in October 2017. [R. 553.] Despite his reported increased symptoms, he indicated he often stayed up into the early morning (between 2:00 a.m. and 5:00 a.m.) playing video games, watching television, and playing the guitar. [R. 52, 553, 584, 727.] One specialist stated that Plaintiff did not have anxiety or depression because those symptoms were better explained by fatigue and his "existential dilemma of not being able to successfully move forward in the world." [R. 586.] The specialist acknowledged that Plaintiff had a subjective sense of depersonalization, but rejected a depersonalization/derealization diagnosis, instead only finding that

---

[2] Dr. Van Meter's biofeedback Assessment Summary indicates that "[a] neurofeedback assessment measures the level of electrical dysregulation present in the brain by analyzing brain wave patterns." [R. 929.]

Plaintiff had idiopathic fatigue (*i.e.*, fatigue with an unknown cause). [R. 555-56.] The specialist explained Plaintiff was "struggling with a future plan at a time when his peer/age group should be differentiating into a career, family, and developing a life plan moving forward" and that Plaintiff's symptoms were an "unconscious means of 'explaining' or rationalizing why he has not been able to move forward in life." [R. 586-87.] The specialist also indicated Plaintiff was "consistently taking a 'passive' role toward life and toward his recovery." [R. 742.] The specialist thought Plaintiff would be a good candidate for the Pain Rehabilitation Center program, treating people with chronic fatigue syndrome, but Plaintiff was not interested in pursuing that treatment. [R. 556.] The specialist also recommended two psychotherapeutic intervention programs, which Plaintiff was "possibly considering." [R. 742.]

In March 2018, state agency mental health consultant Howard Tin, Psy.D., reviewed the records and determined Plaintiff had no medically determinable mental health impairment. [R. 94-95.] Two months later, in May 2018, although Plaintiff reported his depersonalization was worse, his provider noted there was no objective evidence showing the Plaintiff's condition had changed. [R. 922.] In July 2018, state agency mental health consultant Gayle Williamson, Psy.D., opined that Plaintiff could "function generally well from day to day" and that he retained the mental capacity to understand, remember, and concentrate sufficiently to carry out one and two-step instructions/tasks; make simple work decisions; interact and communicate with other sufficiently; and adapt to simple, routine changes with gradual introduction and pressures in the work environment. [R. 110-13.]

In August 2018, Plaintiff declined referrals to programs that treated depersonalization, indicating the programs were not "appropriate" for him. [R. 1024.] In October 2018, Plaintiff claimed to have less energy and frustration with the sexual side effects from his medication, but he presented with more energy and he was able to "function in many aspects of life," including buying and selling equipment. [R. 1003.] He subsequently started and discontinued multiple medications on his own after just a few doses despite providers telling him the importance of giving medications an "adequate" trial.

[R. 1024-25.] In January 2019, Plaintiff declined a referral to a dietician despite reporting self-consciousness about weight. [R. 1025.] In February 2019, he declined a referral to a partial hospital program to increase structure and coping skills. [R. 1025.]

Later that same month, on February 27, 2019, Dr. Van Meter completed a Mental RFC Assessment for Plaintiff. [R. 1014-16.] On or about the same date, Dr. Van Meter wrote a letter to the SSA Disability Determination board in support of Plaintiff's appeal following his initial denial of disability. [R. 1021-22 (undated letter bearing facsimile transmittal date of February 27, 2019).] In his Mental RFC Assessment, Dr. Van Meter found Plaintiff markedly limited in the ability to maintain attention and concentration for extended periods; the ability to perform activities on a schedule, be punctual and maintain regular attendance; the ability to work closely with others or interact with the general public; the ability to make simple work-related decisions; to complete a normal-paced work-week without an unreasonable number of rest periods due to psychological symptoms; and the ability to independently make plans or set realistic goals. [R. 1014-15.] In his supplemental letter in support of Plaintiff receiving disability benefits, Dr. Van Meter also opined that "[Plaintiff] initially presents as a functional young adult. He is well groomed when he attends session and is able to carry on conversation and appears to be no different than any other young man today. Sadly, that is where the similarity ends." [R. 1021.] Dr. Van Meter further opined that Plaintiff's episodes of depersonalization/derealization are not short-lived and usually forgotten, Plaintiff is in the 2% of the population for whom "the episodes continued and worsened over the last several years until they are now consistent and persistent." [*Id.*] He noted that "[n]umerous medications have been attempted over the years, but the side effects have been too severe for him to continue." [*Id.*] Dr. Van Meter opined that Plaintiff also suffers from "panic attacks with some early signs of agoraphobia, depression and anxiety [which] increase the symptoms of the depersonalization and derealization (as they are an unconscious coping mechanism), which then becomes a difficult cycle to break." [R. 1021-22.] Dr. Van Meter opined that Plaintiff's "anxiety over

5

experiencing an acute dissociative reaction to the stress of working then causes a panic attack." [R. 1022.] Finally, it was Dr. Van Meter's opinion that Plaintiff was incapable of working and that he should be found eligible for disability benefits. [*Id.*]

### 1.2. Procedural History

Plaintiff filed for Supplemental Security Income on December 19, 2017 alleging a disability onset date of November 14, 2015. [R. 15.] An administrative hearing was held on March 7, 2019. [R. 41-88.] On May 30, 2019, Administrative Law Judge ("ALJ") Kathleen Kadlec issued an unfavorable decision. [R. 15-31.] Plaintiff requested Appeals Council review, which was denied on March 27, 2020. [R. 1-6.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. Plaintiff, through counsel, filed the instant action on June 1, 2020, seeking review of the Commissioner's decision. [Dkt. 1.]

### 1.3. The ALJ's Decision

On May 30, 2019, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 15-31.] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of December 19, 2017. [R. 17.] At Step Two, the ALJ found that Plaintiff had the severe impairments of history of major depressive disorder, generalized anxiety disorder, depersonalization disorder, obesity, and obstructive sleep apnea ("OSA"). [R. 18.] The ALJ also determined Plaintiff's allergies, hypertension, cervical spine impairment, and postural orthostatic tachycardia syndrome ("POTS") were nonsevere impairments. [R. 18-19.] *Id.* It appears the ALJ was unable to substantiate a medically determinable impairment related to Plaintiff's left knee as the ALJ noted that Plaintiff "also alleged left knee pain but declined to consider physical therapy and there are no ongoing complaints in the file." [R. 19.] At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 19-21.] Before Step Four, the

ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: he can never climb ladders, ropes, or scaffolds, or work at unprotected heights; he can work no more than occasionally near moving mechanical parts; he can never work near operating motor vehicles; he can perform no more than simple, routine, and repetitive tasks but not at a production rate pace; he can make no more than simple work-related decisions; and he can interact no more than occasionally with supervisors, coworkers, or the public. [R. 21-30.] The ALJ found Plaintiff had no past relevant work, but found, at Step Four, that jobs existed in significant numbers in the national economy that Plaintiff could perform. [R. 30-31.] Because of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 31.]

2. **Social Security Regulations and Standard of Review**

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. A court's scope of review in these cases is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). At the same time, in the Social Security context, "the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support,

an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

**3. Discussion**

Once again, Plaintiff asserts the ALJ committed two errors in her analysis of Plaintiff's claims: (1) she improperly discounted the opinion of Plaintiff's treating psychologist, Dr. Van Meter; and (2) she improperly discounted Plaintiff's subjective allegations. The Court disagrees, and addresses both contentions below.

**3.1. The ALJ Properly Evaluated Dr. Van Meter's Opinions**

Because Plaintiff's claim was filed after March 27, 2017, the ALJ applied the agency's new regulations for evaluating medical opinions at 20 C.F.R § 416.920c. This new regulation differs from the previous regulation of 20 C.F.R. § 416.927 in several key aspects relevant to this case. Specifically, the agency no longer has a "treating source rule" deferring to treating source opinions. 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). Additionally, the agency will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a).

While the ALJ must articulate consideration of all medical opinions, the new regulations no longer mandate the "controlling weight" analysis or the "good reasons" standard in weighing a treating source opinion. Compare 20 C.F.R. § 416.927(c)(2) with 20 C.F.R. § 416.920c(a)-(b). Rather, the ALJ focuses on the persuasiveness of the medical opinion(s) using the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, which includes (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and (v) examining relationship; (4) specialization; and (5) other factors. 20 C.F.R. § 416.920c(a)-(c). The ALJ will explain how they considered the factors of supportability and consistency, which are the two most important factors in determining the

8

persuasiveness of a medical source's medical opinion. 20 C.F.R. § 416.920c(b)(2). The ALJ must explain in their decision how persuasive they find a medical opinion(s) based on these two factors. *Id.* In accordance with the regulations, the ALJ may, but is not required to, explain how they considered the other remaining factors. 20 C.F.R. § 416.920c(b)(3). Also noteworthy is that the ALJ may consider one or more medical opinions from the same medical source together using the above factors, and is not required to articulate how they considered each opinion or finding. 20 C.F.R. § 416.920c(b)(l).

Additionally, courts have found that "an ALJ may discount even a treating physician's opinion if it is inconsistent with the medical record." *Ronald B. v. Berryhill*, 2019 WL 2173776, at *5 (N.D. Ill. May 20, 2019); *see also Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021) (finding inconsistency with objective evidence a valid reason to discount a treating physician's opinion).

The ALJ evaluated Dr. Van Meter's opinions contained in his Mental RFC Assessment and letter, compared them to his treatment notes, and ultimately concluded they were not persuasive. [R. 30.] In evaluating Dr. Van Meter's opinions, the ALJ followed the articulation requirements of 20 C.F.R. § 416.920c(b)(2). Specifically, the ALJ indicated Dr. Van Meter's opinions were inconsistent with and not supported by the treatment notes, Plaintiff's declination of treatment, his generally unremarkable mental status examinations, and his daily activities. [R. 30.] The ALJ also noted that Dr. Van Meter's opinion that Plaintiff was incapable of working infringed on a matter reserved for the Commissioner, namely, whether Plaintiff was disabled.[3] [R. 30.]

The Court finds the ALJ properly discounted Dr. Van Meter's opinions due to inconsistency with the Record and lack of support. 20 C.F.R. § 416.920c(c)(1)-(2). For example, the ALJ noted how Dr. Van Meter's own treatment notes indicated Plaintiff was "a contradiction" and that Plaintiff's self-reported symptoms seemed worse than reality reflected (specifically, Dr. Van Meter noted that

---

[3] 20 C.F.R. § 416.920b(c)(3)(i) explains that statements on issues reserved for the Commissioner, such as statements that you are disabled, are inherently neither valuable nor persuasive. Thus, the ALJ correctly indicated that determinations regarding disability are matters reserved for the Commissioner.

Plaintiff "always reports that 'the depersonalization/derealization is worse'" but "[t]here is no objective evidence that things are 'worse' for [Plaintiff]."). [R. 792, 922, 1008.] Dr. Van Meter also noted that "[w]hile [Plaintiff] claimed to be struggling just as much with depersonalization, fatigue and concept of time, he actually did very well and was tracking conversations that had been had previously" and that while Plaintiff "[c]laims no improvement in depersonalization, however he was very alert and focused." [R. 785, 788.] Dr. Van Meter's treatment notes also reflect that Plaintiff "is presenting with more energy, but his experience is that he has less. While [he] is able to function in many aspects of life…he does not recognize any progress." [R. 1003.] The ALJ also noted Plaintiff had above average intellectual functioning, attentional functions within expected range, as well as intact cognitive, learning, and memory functioning during neuropsychological testing. [R. 25 (citing R. 563).] The ALJ identified Plaintiff's mental status examinations as being unremarkable outside of occasional deficits in mood and affect. [R. 25-29 (citing R. 337, 376, 563, 628,637,640, 768, 785, 788, 1019).] Such findings are inconsistent with Dr. Van Meter's assessed marked limitations in Plaintiff's ability to maintain attention and concentration, maintain pace, as well as make simple work-related decisions, execute instructions, and it was not error for the ALJ to have found them to be so. [R. 1014-15.]

The ALJ noted several times that although Plaintiff expressed fatigue, he seemingly constantly played video games into the early morning (going to bed between 2:00 a.m. to 5:00 a.m.) and that one of Plaintiff's providers found it "difficult to determine whether his fatigue led to his depersonalization symptoms or vice versa." [R. 23, 26 (citing R. 294).] The ALJ found that the Record reflected that Plaintiff's playing "video games from the night until morning…exacerbated his symptoms." [R. 30.] Plaintiff also informed his treatment providers that fatigue worsened his depersonalization. [R. 394.] In fact, the specialists at the Mayo Clinic referred to Plaintiff's late-night game playing as a "voluntary behavior" potentially maintaining his delayed sleep-wake phase tendency. [R. 729.] Plaintiff's providers' recommendations regarding maintaining normal sleep habits were particularly important and stressed

10

to Plaintiff because, as his doctor stated, "medical science does not have a good solid explanation or intervention beyond what was recommended regarding his sleep." [R. 742; *see also* R. 488 (Plaintiff counseled that his depression treatment included treating his sleep issues).] Yet, as noted by the ALJ, Plaintiff "did not always comply with his providers' wishes by going to bed early which they believed might improve his symptoms." [R. 29.] Similarly, the ALJ noted that one of Plaintiff's providers "questioned whether the claimant's sleeping issues were 'due to [Plaintiff's] current life priorities,'" and that Plaintiff needed "volition and also discipline" to make any corrections [R. 27 (citing R. 727).] The continual refusal to follow his doctors' orders, recommendations, and suggestions (particularly concerning Plaintiff's sleep schedule) is right in line with Dr. Van Meter's treatment notes (specifically referenced by the ALJ) opining that Plaintiff "was able to maintain focus on things he felt were important." [R. 20 (citing R. 816).] Thus, the ALJ's analysis has support from both Plaintiff's own statements and assessments by treatment providers. It was not error for the ALJ to have determined that the evidence supporting Plaintiff's ability to stay up all night playing video games contrasted Dr. Van Meter's opinions in general (and, more specifically, the opinion that Plaintiff had marked concentration deficits).

In addition, the ALJ pointed out that Plaintiff declined referrals to a clinic that specialized in depersonalization, a dietician for his weight, and a partial hospital program. [R. 27-28, 742, 1023-25.] The ALJ noted Plaintiff "was often non-compliant with his mental health treatment and declined several referrals. Specifically, he unilaterally decided to stop taking multiple medications for a variety of alleged side effects, including sweating, loss of sexual desire, and gaining weight." [R. 29.] Although Plaintiff argues his noncompliance/declination of some treatment supports Dr. Van Meter's opinion [dkt. 25, pp. 8-9], this argument cuts against agency policy and case law. As Social Security Ruling ("SSR") 16-3p indicates, "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall

11

evidence of record." Courts have also consistently found an ALJ has "solid grounds" for discounting claimant's statements where claimant fails without legitimate excuse to comply with treatment. *Coleman v. Astrue*, 269 F. App'x 596, 603 (7th Cir. 2008). Plaintiff excuses for his failure to comply with treatment by pointing to his "providers' decision that medication is of little to no benefit." [Dkt. 25, p. 13 (citing R. 555, recommending that a "psychotropic medication avenue not be pursued); and R. 1025 (physician "discussed [with Plaintiff] the importance of giving his medications an adequate trial in terms of dosage and duration in order to find a solution more efficiently."). However, the Court finds the single reference to recommending against psychotropic medications unpersuasive in light of the overwhelming evidence Plaintiff was largely noncompliant with medications, stopping them as it suited him.[4] The ALJ did not substitute her own judgment for a physician's opinion without relying on other medical evidence or authority as Plaintiff alleged; rather, the ALJ relied upon the opinions of the state agency mental health consultants, the statements from the Mayo Clinic specialists, and Plaintiff's generally unremarkable mental status examinations, daily activities, and declination of treatment that his providers thought would improve his symptoms to discount Dr. Van Meter's statements. [R. 30.]

Finally, Plaintiff's own statements also contradicted Dr. Van Meter's opinions. *See Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (ALJ reasonably discounted treating physician's opinion that "contradicts both the objective medical evidence and [the plaintiff's] own account of his abilities"). For instance, although Dr. Van Meter found Plaintiff had marked limitations in working in coordination with others, setting realistic goals or making independent plans, as well as interacting with the general public, the ALJ noted that Plaintiff reported spending time with others and had no difficulties getting along with family, friends, neighbors, or authority figures, played in various bands, interacted with others online, and played video games from night into morning, all in contrast to Dr. Van Meter's opinions.

---

[4] Moreover, even Dr. Van Meter's treatment notes not specifically cited by the ALJ contain *numerous* mentions of Plaintiff's rapid noncompliance with his medications and refusal to even consider other suggested treatments. [*See, e.g.,* R. 806-807, 809, 816-17, 923, 996, 998, 1010.]

12

[R. 26, 29-30 (citing R. 239-41, 1014-15).]

In light of the foregoing regarding the ALJ's treatment of Dr. Van Meter's opinions, the ALJ thoroughly satisfied her obligation to minimally articulate her conclusions concerning his opinions. The Court declines to remand on this basis.[5]

### 3.2. The ALJ Appropriately Addressed Plaintiff's Subjective Allegations

The regulations set forth a two step process for evaluating a plaintiff's statements about his impairments. See 20 C.F.R. § 416.929. An ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the plaintiff's symptoms

---

[5] As Plaintiff does not raise the issue of the opinions of State agency doctors Tin and Williamson in his opening brief and dedicates one vague sentence in his reply brief on these "other opinions" [dkt. 32, p. 3], it is arguable Plaintiff has waived this issue. *Carter v. Astrue*, 413 F. App'x 899, 906 (7th Cir. Mar. 4, 2011) ("[i]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.'") (citations omitted); *see also*, *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("issues adverted to in perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to…put flesh on its bones."). However, Defendant has raised it, and the Court finds it important to address here. Specifically, the Court finds the ALJ sufficiently minimally articulated her conclusion that the well-supported and consistent opinions of the State agency mental health consultants Drs. Tin and Williamson were more persuasive than the inconsistent and unsupported opinions of Dr. Van Meter. Drs. Tin and Williamson both determined Plaintiff was not disabled and retained the mental capacity to understand, remember, and concentrate sufficiently to carry out one and two-step instructions/tasks; make simple work decisions; interact and communicate with other sufficiently; and could adapt to simple, routine changes with gradual introduction and pressures in the work environment. [R. 95, 110-13.] In evaluating their opinions, the ALJ discussed "the two most important factors" of supportability and consistency. 20 C.F.R. § 416.920c(b)(2). The ALJ indicated the opinions of Drs. Tin and Williamson were congruent with Plaintiff's unremarkable mental status examinations, improved symptoms with medication, and his daily activities. [R. 29.] The record supports these reasons (*i.e.*, Plaintiff had normal mental status examinations or only deficits in mood and affect, reported feeling better with medication on multiple occasions, and participated in a high level of daily activities). [R. 25-29 (citing R. 235-43, 331, 337, 388, 376, 533, 563, 628, 637, 640, 709, 726, 768, 770, 785, 788, 803, 1019).] Moreover, Dr. Williamson and Tin's opinions are generally consistent, as they both concluded Plaintiff remained capable of working. Likewise, their opinions are congruent with the Mayo Clinic specialists' statements that Plaintiff's symptoms were an "unconscious means of 'explaining' or rationalizing why he has not been able to move forward in life." [R. 586-87.] The Seventh Circuit has regularly affirmed decisions where an ALJ cited reviewing physician opinions in support of their decision. *See, e.g., Stephens v. Berryhill*, 888 F.3d 323,329 (7th Cir.2018) (affirming ALJ who cited reviewing physician opinions in support of his decision); *Hall v. Astrue*, 489 F. App'x 956, 958 (7th Cir. 2012) (affirming ALJ's decision to give greater weight to non-examining state agency physicians' opinions "because those opinions were more consistent with the objective medical evidence"). Accordingly, because the ALJ followed the articulation requirements of 20 C.F.R. § 416.920c(b)(2) and comprehensively addressed the supportability and consistency of their opinions, she reasonably evaluated the opinions of Drs. Tin and Williamson. Ultimately, it was not error for her to have found them more persuasive than the opinions of Dr. Van Meter. Nor does the Court find it unreasonable for the ALJ to have relied on these opinions even though Drs. Tin and Williamson rejected the notion that Plaintiff had a mental impairment and the ALJ found one.

and determines how they limit the plaintiff's "capacity for work." 20 C.F.R. § 416.929. In applying the second step, the ALJ assesses whether medical evidence substantiates the plaintiff's symptoms. *See* SSR l6-3p. If medical evidence does not confirm the intensity and persistence of the claimed symptoms, the ALJ considers a list of non-exhaustive factors. *See id.* An ALJ's assessment of a plaintiff's subjective statements of symptoms need not be flawless and is entitled to deference unless it is "patently wrong," which is a "high burden." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010). Perhaps most succinctly, the question for the Court is not whether the evidence could support greater restrictions, but whether substantial evidence supports the restrictions that the ALJ found. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

First, the ALJ provided a thorough analysis of Plaintiff's treatment for over seven years, including multiple references to his symptoms waxing and waning. [R. 24-28.] *Buchholtz v. Barnhart*, 98 F. App'x 540, 544 (7th Cir. 2004) (ALJ may consider course of treatment). Then the ALJ considered the objective medical evidence and the extent to which Plaintiff's subjective statements could reasonably be accepted as consistent with record evidence. [R. 22-28.] 20 C.F.R. § 416.929(c)(2). For instance, in contrast to Plaintiff's statements of severe fatigue, the ALJ noted that a specialist at the Mayo Clinic questioned whether Plaintiff's sleeping issues were "due to the [Plaintiff's] current life priorities," as he was playing video games into the early morning hours. [R. 27 (citing R. 727).] The ALJ also identified that a different specialist at the Mayo Clinic did not believe Plaintiff suffered from a mental health impairment despite his assertions of disabling mental health symptoms. [*Id.* (citing R. 742).] Rather, the specialist attributed Plaintiff's reported symptoms to his existential dilemma of "not being able to successfully move forward in the world." [R. 555.] The specialist further explained that Plaintiff was "struggling with a future plan at a time when his peer/age group should be differentiating into a career, family, and developing a life plan moving forward…the symptoms are an unconscious means of 'explaining' or rationalizing why he has not been able to move forward in life." [R. 555-56, 716.] In

14

addition, the ALJ referenced the fact that many mental status examinations were unremarkable except for deficits in mood and affect. [R. 25-29.] The treatment provider Plaintiff most heavily relied on the opinions of, Dr. Van Meter, even described Plaintiff as a contradiction; his self-reported symptoms seemed worse than reality reflected and noted that despite his subjective reports of worsening symptoms, there was no "objective evidence things are worse." [R. 792, 922, 1008.]

The ALJ also noted that "[s]everal providers believed [Plaintiff] did not have depersonalization disorder," but did not cite to the Administrative Record for this proposition. [R. 29.] Plaintiff contends this was illogical because the ALJ found Plaintiff's depersonalization disorder to be a severe impairment, yet relied on unspecified providers for the notion Plaintiff did not have depersonalization disorder. [Dkt. 25, p. 12.] The Court finds it extremely likely the ALJ was referring Mayo Clinic specialist Dr. Brian Sutor, MD, who felt Plaintiff had a subjective sense of depersonalization, but refused that diagnosis, questioning Plaintiff's subjective reported symptoms as rationalizations of being unable to move on in his life; Dr. Sutor ultimately only diagnosed Plaintiff with idiopathic fatigue. [R. 555-56.] The ALJ could also be referring to the record indicating that a psychiatric nurse at the Mayo Clinic told Plaintiff "depersonalization was not a valid diagnosis" for him. [R. 811.] Regardless, the Court does not find it illogical for the ALJ to acknowledge Plaintiff had been diagnosed with depersonalization disorder, but discount the severity of his reported symptoms based on the assessments of his providers who questioned whether he has a mental health impairment (irrespective of the nature of that impairment) because his providers' evaluations clearly evidenced inconsistency with his alleged symptoms. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020) ("ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record."). The missing citation does not change the fact the Record reflects that at least two providers did not accept the severity of Plaintiff's alleged symptoms, which supports the ALJ's assessment.

In addition to referring to these contradictions between Plaintiff's subjective complaints and

15

the reality Plaintiff's treatment providers observed, the ALJ also found it noteworthy that Plaintiff had generally unremarkable mental status examinations, except for some deficits in mood and affect. [R. 29.] Although these mental status examinations were not the sole reason for discounting Plaintiff's subjective complaints, it was not an error for the ALJ to have considered Plaintiff's generally normal mental status examinations in her substantial evidence analysis. *See, e.g., Kathleen C. v. Saul*, 2020 WL 2219047, at \*4 (N.D. Ill. May 7, 2020) (ALJ acknowledged plaintiff's diagnosis of depression but found it noteworthy that progress notes demonstrated plaintiff was still able to function normally in the areas of memory, judgment, thought processes, and concentration while dealing with her depression). Moreover, there is nothing suggesting that Plaintiff's performance on mental status examinations is an incomplete picture of his condition. In fact, even Dr. Van Meter found Plaintiff to be a "contradiction" in that he often did not manifest the distress or worsening of his condition he claimed to be feeling [R. 792, 922, 1008], despite the fact that, as explained by Dr. Van Meter, depersonalization "symptoms cause significant distress or impairment in social, occupational or other areas of functioning." [R. 1021]. Thus, substantial evidence supports the ALJ finding inconsistencies between Plaintiff's contemporaneous treatment records and his subjective complaints based on Plaintiff's largely unremarkable mental status examinations.

The ALJ also discussed the effectiveness of Plaintiff's medication when assessing his subjective symptoms. 20 C.F.R. § 416.929(c)(3)(iv) (ALJs should consider effectiveness of medication in assessing claimant's subjective symptoms). The ALJ noted Plaintiff reported feeling better with medication on multiple occasions. [R. 25-26 (citing R. 331, 388, 770).] Plaintiff's mother also testified he felt better on one specific medication, but that he was no longer taking any medication. [R. 63-64.] In fact, the ALJ noted that Plaintiff was often noncompliant with his mental health treatment and declined several referrals. [R. 29.] The ALJ noted that Plaintiff unilaterally decided to stop taking multiple medications for a variety of alleged side effects after just a few doses of each medication despite his providers

16

counseling him on giving his medication an adequate trial in terms of dosage and duration. [R. 28-29 (citing 1023-25 (Dr. Morrison discussed with Plaintiff "the importance of giving his medications an adequate trial in terms of dosage and duration in order to find a solution more efficiently")); *see also* fn. 4, *supra*, and R. 816-17 (Dr. Van Meter encouraged Plaintiff to "follow[] through on something further rather than quitting as soon as it didn't give him the results he wanted.").] Additionally, the ALJ indicated Plaintiff declined referrals to clinics that specialized in depersonalization, a dietician for his weight, and a partial hospital program to increase structure and coping skills. [R. 27-28, 742, 1023-25.] Similarly, the ALJ noted Plaintiff did not fully engage with the Department of Rehabilitation Services. [R. 29.] Notably, Plaintiff's treatment provider indicated he was actively trying to get out of the job search program. [R. 923.]

The Court finds no error in the way the ALJ weighed Plaintiff's course of treatment, including declining referrals and stopping medication, against the severity of his subjective complaints. A "failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure…" *Joseph M v. Saul*, 2019 WL 6918281, at * 10 (N.D. Ill. Dec. 19, 2019) (citing *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)); SSR 16-3p ("if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record"). Here Plaintiff failed to provide good reasons for his multiple instances of noncompliance. The fact the ALJ discounted Plaintiff's alleged severity of symptoms in part because of his noncompliance indicates to the Court she did not find Plaintiff had good reasons for his lack of compliance. [R. 29.] Although he reported side effects from medications (which the ALJ noted three times throughout her opinion [R. 27, 28, 29]), the ALJ also weighed the fact his providers counseled him on giving his medication an adequate trial in terms of dosage and duration, which Plaintiff ignored, as he continued to stop varied prescription medications after just a few doses. [R. 28-29, 1024-25.] As to Plaintiff's refusal of referrals to clinics that

17

treat depersonalization, Plaintiff merely indicated they were not "appropriate" for him, which is not a good reason. [R. 28-29, 1024.] Similarly, he gave *no reasons* for his declined referral to a dietician and partial hospital program. [R. 1025.] Even if the Court accepted Plaintiff's position that the ALJ erroneously analyzed Plaintiff's noncompliance (it does not), the ALJ's analysis constitutes harmless error because the ALJ gave multiple reasons for discounting Plaintiff's subjective symptoms. *Roxanne L. v. Berryhill*, 2019 WL 2173789, at *3 (N.D. Ill. May 20, 2019) ("If medication non-compliance were the sole rationale, the Court would remand the case. But the Court does not find the ALJ's errors are so substantial that they contaminate the multiple other valid rationales."); *see also Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) ("Plaintiff has not shown that a new proceeding could lead to a different result because she has not pointed to anything in the record to show that her doctors considered more invasive treatments, nor has she identified any specific reason that she did not seek more treatment.").

Similarly, the Court finds no error in the ALJ's weighing of Plaintiff's failed attempt to work with the Department of Rehabilitation Services ("DRS"). Plaintiff's objections to the ALJ's analysis in this respect rests on his own subjective statements echoed by Dr. Van Meter. [Dkt. 25, pp. 13-14.] However, because the Agency cannot find an individual disabled based on alleged symptoms alone, the Court finds no error in the ALJ's analysis of Plaintiff's failed DRS attempt. 20 CFR § 416.929(a); SSR 16-3p; *see also*, *Zoch*, 981 F.3d at 601 (a "claimant's assertions…taken alone, are not conclusive of a disability.")

Next, the ALJ found that Plaintiff's daily activities were not consistent with his allegations of disabling symptoms. See 20 C.F.R. § 416.929(c)(3)(i) (daily activities a relevant factor in evaluating a claimant's subjective symptoms). Specifically, the ALJ identified that Plaintiff cared for his personal needs and grooming without reminders; prepared his own meals daily; performed household chores such as cleaning and washing laundry; mowed the lawn; played guitar for hours; watched television; drove; shopped in stores for groceries and electronics; sold videogames and electronics online and

18

interacted with customers when doing so; attended medical appointments; and managed money. [R. 28-29 (citing R. 235-43, 553, 726, 1003).] In addition, the ALJ noted Plaintiff was able to get along with others (including authority figures) without difficulty; spent time with others online playing games; attended multiple years of college; saw friends regularly; had a girlfriend for a period; put together and played in various bands; and travelled out of town. [R. 20, 26, 29 (citing R. 235-43, 477, 553, 709, 803).] Likewise, he attended a wedding and parties. [R. 460, 464.] The ALJ explained that despite Plaintiff's claims of fatigue and foggy-mindedness from his mental impairments (as well as physical impairments), he was able to play video games with friends for many hours into the night, drive himself to doctor appointments, and work several hours per week at his father's law firm. [R. 29.]

Although Plaintiff claims his impairments affected his daily activities (specifically his ability to play video games for hours, drive to appointments, and work) in detrimental ways (Plaintiff cites his own testimony that he has short "blackouts" where he will not remember what happened) [dkt. 25, pp. 14], an ALJ is "permitted to consider that mismatch between [a claimant's] daily activities and [their] symptom description. *Regina P. v. Saul*, 2020 WL4349888, at *5 (N.D. Ill. July 29, 2020) (citing *Green v. Saul*, 781 Fed. Appx. 522, 526-27 (7th Cir. 2019)). In light of the ALJ's detailed analysis of Plaintiff's daily activities, including these and many other activities the ALJ also cited in support of her decision (*see supra*) the Court will not reweigh the ALJ's consideration of those activities. *Id.*; *Young*, 362 F.3d at 1001 (7th Cir. 2004) (court may not reweigh evidence). Moreover, the Court finds Plaintiff's citations to his own subjective statements undermine the persuasiveness of his argument.

Finally, the ALJ properly considered Plaintiff's work history, noting that he worked part-time despite his impairments. [R. 25-26, 28-29 (citing R. 54, 792, 972)]; 20 C.F.R. § 416.929(c)(3). SSR 16-3p indicates an ALJ may consider Plaintiff's "prior work record and efforts to work" in assessing subjective symptoms. An ALJ is even "entitled to consider plaintiff's part-time work after [the] alleged onset date." *Dorothy B. v. Berryhill*, 2019 WL2325998, at *4 (N.D. Ill. May 31, 2019). Similarly, Plaintiff's work for a

19

family member does not prevent consideration. *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) ("claimant's work activities can be considered even if he was only given the opportunity to work due to a family relationship"). Thus, the Court finds no error in the ALJ's consideration of Plaintiff's efforts at working since his onset date.

In toto, the ALJ reviewed, acknowledged, and assessed Plaintiff's alleged symptoms and limitations, and then used the factors in the regulations and agency policy to thoroughly explain why they were not fully consistent with the objective and other relevant evidence in the record. [R. 22-29]; 20 C.F.R. § 416.929(c)(3)(ii). Accordingly, for the multiple reasons set forth above, the Court finds the ALJ reasonably evaluated Plaintiff's subjective symptoms. Remand is not appropriate on this basis.

**4. Conclusion**

Plaintiff's motion for summary judgment [dkt. 25] is DENIED; Defendant's motion for summary judgment [dkt. 30] is GRANTED. The Court affirms hereby the final decision of the Commissioner denying benefits.

**ENTERED: November 8, 2021**

_____
Susan E. Cox,
United States Magistrate Judge